IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

CASE NO. 3:24-cv-00511-FDW

| | |
|---|---|
| **JOHNNY E. MILLER,**<br><br>    Plaintiff,<br><br>v.<br><br>**CHARLOTTE-MECKLENBURG BOARD OF EDUCATION, DR. CRYSTAL HILL,** individually and in her capacity as Superintendent of Charlotte-Mecklenburg Schools; **DR. JACKIE BARONE,** individually and in her capacity as Principal of Piedmont Middle School; and **RACHEL TAPIA,** individually and in her capacity as a teacher at Piedmont Middle School,<br><br>    Defendants. | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES

## INTRODUCTION

1. This is an employment discrimination and civil rights action brought by Plaintiff Johnny E. Miller ("Plaintiff" or "Mr. Miller"), an African-American male and former sixth-grade science teacher at Piedmont Middle School, against Charlotte-Mecklenburg Board of Education ("Defendant Board" or "CMS"), Dr. Crystal Hill ("Defendant Hill"), and Dr. Jacqueline Barone ("Defendant Barone"), and Rachel Tapia ("Ms. Tapia") (collectively "Defendants"). This action arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. and Civil Rights Act of 1870, 42 U.S.C. § 1981, and

1

related federal and state laws, seeking redress for Defendants' discriminatory treatment, creation of a hostile work environment, and wrongful termination of Plaintiff based on his race and gender, as well as retaliation for engaging in protected activities.

2.  Throughout his employment from August 2012 until his wrongful termination in March 2024, Plaintiff endured persistent discrimination, harassment, and retaliation, culminating in a physical assault by Defendant Tapia and his subsequent termination. Despite Plaintiff's exemplary service as both a teacher and person, maintaining appropriate professional standards, and following proper procedures for reporting concerns, Defendants engaged in a pattern of discriminatory conduct, failed to address reported incidents of harassment, and ultimately terminated his employment on pretextual grounds. Plaintiff seeks compensatory and other appropriate remedies against Defendant Board to the extent provided by law, and other appropriate remedies for the violations of his civil and employment rights.

## JURISDICTION AND VENUE

3.  This Court has original subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(4), as this action arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. and Civil Rights Act of 1870, 42 U.S.C. § 1981 and Equal Pay Act of 1963.

4.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as these claims are so related to the federal claims that they form part of the same case or controversy.

5.  Venue is proper in the Western District of North Carolina pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to these claims

occurred within this judicial district. Specifically, Plaintiff's employment with Charlotte-Mecklenburg Schools was based at Piedmont Middle School in Charlotte, North Carolina, and the discriminatory acts, hostile work environment, and wrongful termination occurred within this district.

6. Plaintiff has exhausted all administrative remedies and satisfied all conditions precedent to filing this action. Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on February 24, 2023 (Case #430-2023-01388) and received a Notice of Right to Sue on April 30, 2024. This action is being filed within ninety (90) days of Plaintiff's receipt of the Notice of Right to Sue.

## PARTIES

7. Plaintiff **JOHNNY E. MILLER** is a sixty-two 62-year-old African American male citizen and resident of South Carolina, residing at 1829 Paces River Ave #14-106, Rock Hill, SC 29732. Plaintiff holds a Master's degree in Theology from Duke University and is an honorably discharged United States Air Force veteran. From August 2012 until March 28, 2024, Plaintiff was employed by Charlotte-Mecklenburg Schools as a sixth-grade science teacher at Piedmont Middle School and Chess Team Coordinator.

8. At all relevant times, Plaintiff was an "employee" within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(f), and related federal and state employment statutes.

9. Defendant **CHARLOTTE-MECKLENBURG BOARD OF EDUCATION ("CMS")** is a corporate governmental unit organized and existing under the laws of North Carolina, operating as a public school system with its principal place of business at 4421 Stuart Andrew Boulevard, Charlotte, NC 28217. At all relevant times, CMS was an

3

"employer" within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b), employing more than 15 employees. Upon information and belief, Defendant Board has waived its governmental immunity, in whole or in part, by the procurement of liability insurance pursuant to N.C. Gen. Stat. § 115C-42, and is therefore subject to suit on Plaintiff's state law tort and negligence claims to the extent of such insurance coverage. Defendant Board has also waived its governmental immunity with respect to Plaintiff's contract-based claims by voluntarily entering into a contract of appeal rights with Plaintiff as it relates to the termination of his employment.

10. Defendant **DR. CRYSTAL HILL** is, upon information and belief, a citizen and resident of North Carolina and serves as the Superintendent of Charlotte-Mecklenburg Schools. At all relevant times, Defendant Hill possessed and exercised supervisory authority over CMS employees and was responsible for implementing and enforcing CMS policies and procedures. Defendant Hill is not sued in duplication of Defendant Board with respect to state law torts. Defendant Hill is sued in her individual capacity and, with respect to Plaintiff's federal claims only, in her official capacity.

11. Defendant **DR. JACKIE BARONE** is, upon information and belief, a citizen and resident of North Carolina and serves as the Principal of Piedmont Middle School, located at 1241 East 10th Street, Charlotte, NC 28204. At all relevant times since 2013, Defendant Barone possessed and exercised direct supervisory authority over Plaintiff and other employees at Piedmont Middle School. Defendant Barone is not sued in duplication of Defendant Board with respect to state law torts. Defendant Barone is sued in her individual capacity and, with respect to Plaintiff's federal claims only, in her official capacity.

4

12. Defendant **RACHEL TAPIA** is, upon information and belief, a citizen and resident of North Carolina and is employed as a seventh-grade teacher at Piedmont Middle School. At all relevant times, Defendant Tapia was acting within the course and scope of her employment with CMS when engaging in the conduct described herein.

### GENERAL ALLEGATIONS AND BACKGROUND FACTS

13. In August 2012, Plaintiff was hired by Charlotte-Mecklenburg Schools as a sixth-grade science teacher at Piedmont Middle School under then-Principal Dee Gardner ("Principal Gardner").

14. At the time of his appointment, Plaintiff, who holds a Master's degree in Theology from Duke University, a Minor Degree in Chemistry, and is an honorably discharged U.S. Air Force veteran, was teaching social studies at another Charlotte-Mecklenburg School, namely Vance. Principal Gardner offered him a position as a science teacher or social studies teacher under her leadership.

15. Principal Gardner informed Plaintiff that she had openings for both social studies and science teachers, but a greater need for science instructors. She advised Plaintiff that if he taught science, he would still receive additional pay for his advanced education and degree.

16. During his initial employment under Principal Gardner's leadership, Plaintiff performed his duties exceptionally and without incident. However, following Gardner's retirement in 2013 and the appointment of Defendant Barone as Principal, Plaintiff began experiencing discriminatory treatment based on his race and gender.

17. From 2013 onwards, Defendant Barone engaged in a pattern of discriminatory conduct toward Plaintiff, including but not limited to disparate treatment in work

5

assignments, scrutiny of his performance, and denial of professional opportunities afforded to non-African American and female teachers.

18. Throughout the duration of his employment, Plaintiff requested that Defendant Barone award him additional pay for his advanced education. Defendant Barone appeared to look into the additional pay, but no additional pay was afforded to Plaintiff.

19. Also, in 2022, Plaintiff lodged formal complaints for the denial of equal pay based on the denial of additional pay for his advanced degree and education.

20. Spring semester 2022, Defendants organized a field trip for the students that had disproportionate impact on African-American children, effectively eliminating them from the field trip and educational opportunity while affording it to the White students.

21. Plaintiff filed formal complaints and grievances on behalf of African-American students. In a meeting with administration, Defendants admitted to their racial disparate treatment of African-American students.

22. In May 2022, in response to Defendants' discrimination of African-American students, Plaintiff organized a field trip to Bank of America Stadium for his students, securing approval and collecting $1,474.69 in student fees. Despite initial approval, Defendant Barone abruptly cancelled the field trip, affecting 9 of 12 sixth-grade classes, while allowing similar field trips organized by non-African American teachers to proceed.

23. On October 25, 2022, Plaintiff filed a formal complaint with CMS Human Resources regarding the discriminatory treatment he was experiencing, particularly concerning the field trip cancellation and other instances of racial discrimination. No meaningful investigation or corrective action resulted from this complaint.

24. On January 27, 2023, Plaintiff was physically assaulted by Defendant Tapia, who confronted him in the school recess area (near the track and field), blocked his path multiple times, elbowed him in the chest twice, and attempted to grab his upper arm. This incident was witnessed by approximately 20-30 students and teachers and was captured on the school's security cameras.

25. Despite filing a police report regarding the assault and reporting the incident to school administration, no disciplinary action was taken against Defendant Tapia. Instead, Plaintiff began experiencing increased hostility and retaliation for reporting the incident.

26. On February 24, 2023, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission, alleging racial discrimination, gender discrimination, hostile work environment, and retaliation.

27. Following his EEOC complaint, Defendants escalated their retaliatory actions against Plaintiff. On November 14, 2023, Plaintiff was suspended with pay, purportedly due to unrelated incidents involving arrests in Kentucky and South Carolina, despite the fact that the charges had been, or were in the process of being, dropped and were related to a contentious divorce proceeding. Plaintiff at all times maintained his innocence and informed Defendants that the charges were meritless and would be dismissed.

28. On January 26, 2024, Defendants issued a Notice of Intent to Terminate Plaintiff's employment, citing multiple arrests and alleged failures to report such arrests within a 5-day window. On February 7, 2024, Plaintiff was suspended without pay.

29. The grounds for termination cited by Defendants were pretextual, as evidenced by the fact that non-African American employees with similar circumstances were

7

treated more favorably and were not subjected to termination or disciplinary action. The pretextual nature of the charges used to justify Plaintiff's termination is demonstrated by the subsequent official dispositions of those charges. With respect to the Kentucky charges, all criminal trespassing charges filed against Plaintiff in Bullitt County District Court were dismissed on February 2, 2024 and February 13, 2024 — prior to Plaintiff's termination on March 28, 2024. With respect to the South Carolina charge, Plaintiff was found Not Guilty by jury trial on the charge of Harassment 2nd Degree in Rock Hill Municipal Court on September 10, 2025. Notwithstanding that most of the Kentucky charges were already dismissed before the termination hearing, Defendants proceeded with and completed Plaintiff's termination, demonstrating that the charges served merely as a pretext for the discriminatory and retaliatory conduct described herein.

30.   The grounds for termination cited by Defendants were pretextual, as evidenced by: (a) the dismissal of the Kentucky charges prior to the date of termination; (b) Plaintiff's subsequent acquittal on all South Carolina charges; (c) the fact that non-African American employees with similar circumstances were treated more favorably and were not subjected to termination or disciplinary action; and (d) Defendants' own policy allowing for discretion in cases where a conviction would not indicate that the employee poses a threat, yet Defendants relied solely on the mere fact of arrest to justify termination.

31.   On March 28, 2024, following a termination hearing, Plaintiff's employment was terminated. Throughout the termination process, Defendants failed to consider Plaintiff's exemplary teaching record, his positive impact on students, the pending and

8

subsequently dismissed status of the criminal charges, or the discriminatory nature of their actions.

32. The termination process itself was tainted by discriminatory animus, as evidenced by the selective enforcement of policies, disparate treatment in the investigation and hearing process, and the failure to consider mitigating circumstances or alternative disciplinary measures.

33. Throughout his employment at Piedmont Middle School, Plaintiff was subjected to disparate treatment in compensation, as he was denied proper placement on the Master's degree pay scale despite holding a qualifying advanced degree, while non-African American teachers with similar qualifications were properly compensated.

34. Defendants maintained different standards for African American male teachers compared to other teachers, particularly in areas of discipline and performance evaluations. For example, Plaintiff's complaints of the disparate treatment of African-American children and the denial of development opportunities for them were routinely denied or delayed, while similar requests from non-African American teachers and children were granted.

35. The hostile work environment created by Defendants caused Plaintiff significant emotional distress, impacted his professional reputation, and resulted in economic damages including lost wages, benefits, and future earning capacity.

36. Defendants' discriminatory actions have caused Plaintiff to suffer severe emotional distress, anxiety, humiliation, and damage to his professional reputation, requiring him to seek medical treatment and counseling.

37. As a direct result of Defendants' unlawful actions, Plaintiff has suffered and continues to suffer substantial damages, including but not limited to:

a. Loss of employment and income;

b. Loss of benefits including health insurance and retirement benefits;

c. Damage to professional reputation and career prospects;

d. Emotional distress, anxiety, and depression;

e. Medical expenses for treatment of physical and emotional injuries;

f. Attorney's fees and legal costs.

38. The pattern of discrimination, harassment, and retaliation experienced by Plaintiff is part of a broader institutional problem within CMS, where African American male teachers are systematically subjected to disparate treatment and adverse employment actions at a disproportionate rate compared to other teachers.

39. Defendants' discriminatory conduct was willful, wanton, and malicious, demonstrating a reckless disregard for Plaintiff's federally protected rights. The conduct of Defendants was particularly egregious given:

a. The documented physical assault against Plaintiff;

b. The deliberate failure to investigate or address reported incidents of discrimination;

c. The retaliatory nature of the termination process;

d. The systematic pattern of disparate treatment;

e. The pretextual nature of the grounds for termination; and

f. Defendants' decision to proceed with termination notwithstanding the dismissal of the underlying Kentucky criminal charges prior to the termination hearing.

40. Despite Plaintiff's repeated attempts to address these issues through proper channels, including formal complaints to HR, EEOC filings, and direct communications with supervisors, Defendants consistently failed to take appropriate corrective action or engage in good faith efforts to address the discrimination and hostile work environment.

41. The discriminatory treatment experienced by Plaintiff has not only affected his professional life but has also had severe personal consequences, including:

   a. Strain on family relationships;

   b. Financial hardship;

   c. Deterioration of physical and mental health;

   d. Loss of professional standing in the educational community; and

   e. Ongoing emotional trauma and stress.

42. Throughout his employment with CMS, Plaintiff maintained appropriate professional standards, followed proper procedures for reporting concerns, and consistently performed his duties in an exemplary manner, as evidenced by his positive impact on students and contributions to the school community through his role as Chess Team Coordinator.

43. The discriminatory and retaliatory actions taken against Plaintiff were particularly egregious given his status as:

   a. A veteran who had honorably served his country;

   b. An educated professional with advanced degrees;

   c. A positive role model for minority students;

   d. A dedicated educator with a proven track record; and

11

e. A valued member of the school community who volunteered additional time for extracurricular activities.

44. Defendants' actions have had a chilling effect on other minority educators within the CMS system, creating an atmosphere of fear and intimidation that discourages the reporting of discrimination and reinforces systemic barriers to equal employment opportunities.

45. The pretextual nature of Plaintiff's termination is further evidenced by:

a. The timing of the disciplinary actions following his EEOC complaint;

b. The selective enforcement of reporting requirements;

c. The failure to consider alternative disciplinary measures;

d. The rushed nature of the termination proceedings;

e. The disparate treatment compared to similarly situated non-African American employees; and

f. The dismissal of the Kentucky criminal charges prior to the termination date, and the subsequent acquittal on all South Carolina charges.

46. As a direct result of Defendants' unlawful conduct, Plaintiff has been forced to seek alternative employment in a different school district, causing significant disruption to his career trajectory and professional relationships, as well as requiring relocation and adjustment to new employment circumstances.

47. The totality of circumstances surrounding Plaintiff's employment and termination demonstrate a clear pattern of discrimination, including:

a. The abrupt change in treatment following Principal Gardner's retirement;

b. The physical assault incident that went unaddressed;

c. The discriminatory cancellation of the field trip;

d. The disparate enforcement of policies;

e. The retaliatory response to his EEOC complaint; and

f. The pretextual nature of his termination, confirmed by the resolution of all underlying criminal charges in Plaintiff's favor.

48.  Throughout his employment with CMS, Plaintiff was denied equal access to:

a. Educational development opportunities for African-American children;

b. Fair and unbiased performance evaluations;

c. Proper compensation based on his qualifications;

d. Protection from physical assault and harassment;

e. Fair investigation of his complaints; and

f. Due process in disciplinary proceedings.

49.  The discriminatory conduct of Defendants has caused lasting damage to Plaintiff's career in education, requiring extensive remedial measures to address the professional, personal, and financial consequences of their unlawful actions.

50. On July 15, 2025, Plaintiff received a "Notice of Charge of Professional Misconduct by the State Board of Education" in which it states that CMS reported his dismissal for misdemeanor harassment and contempt of court, resulting in multiple days of incarceration during the school year.

51.  Plaintiff was scheduled to appear before the disciplinary commission on September 12, 2025, to determine if his license to teach should be revoked.

## CLAIMS FOR RELIEF

## COUNT I

13

## Violation of Title VII of the Civil Rights Act of 1964 and 42 USC § 1981 -

## Race Discrimination

## (Against All Defendants)

52. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

53. At all relevant times, Plaintiff was an African American male employee of CMS and a member of a protected class under Title VII.

54. Plaintiff was qualified for his position as a sixth-grade science teacher and performed his job duties satisfactorily, as evidenced by his teaching record and positive impact on students.

55. Defendants discriminated against Plaintiff because of his race through actions including, but not limited to:

   a. Subjecting him to heightened scrutiny and different standards of performance;

   b. Denying him development opportunities for African-American children;

   c. Cancelling his approved field trip while allowing similar trips by non-African American teachers;

   d. Failing to properly compensate him according to the Master's degree pay scale;

   e. Subjecting him to disparate disciplinary measures; and

   f. Ultimately terminating his employment on pretextual grounds, relying on criminal charges that had been or were in the process of being dismissed.

56. Similarly situated non-African American employees were treated more favorably than Plaintiff under similar circumstances.

14

57. Defendant Hill possessed supervisory authority over CMS employees with the power to take tangible employment actions against Plaintiff.

58. On January 26, 2024, Defendant Hill issued the Notice of Grounds for Dismissal, citing Plaintiff's arrests as proof of insufficient honesty, integrity, and ethics. The dismissal recommendation was based solely on a "pattern of nine arrests" — Defendant Hill confirmed this under oath at the termination hearing.

59. Plaintiff notified Defendant Hill directly that the charges stemmed from a racially biased prosecution by the City of Rock Hill — all involving his ex-wife who was a Rock Hill Police employee — and that the charges were being dismissed.

60. The charges Defendant Hill relied upon were subsequently acquitted and dismissed — the very charges Defendant Hill stated as of the hearing had not been dismissed. This directly undermines the stated basis for termination and supports a pretext argument.

61. Defendant Hill proceeded with the termination even while Plaintiff's criminal charges were still on appeal and several had already been dropped, without waiting for resolution.

62. Defendant Barone, likewise, discriminated against Plaintiff and African-American children at CMS based upon race as stated above. In Spring 2022, a field trip was organized with disproportionate impact on African American students. When Plaintiff complained, Defendants allegedly admitted to racially disparate treatment. Defendant Barone then cancelled Plaintiff's separately-organized Bank of America Stadium field trip — which served 9 of 12 classes (predominantly minority students) — despite everything being fully planned, funded ($1,474.69 collected), and approved. The

15

three classes that were allowed to proceed on a separate trip were predominantly white (~80% white) in a school with 80% minority students.

63. Three days after the field trip cancellation, Defendant Barone began a campaign to see that Plaintiff was both tarnished and terminated.

64. Defendants' stated reasons for their adverse employment actions against Plaintiff were pretextual and designed to mask their discriminatory intent.

65. As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff has suffered and continues to suffer:

a. Loss of employment and income;

b. Loss of benefits;

c. Emotional distress and mental anguish;

d. Damage to professional reputation;

e. Loss of career opportunities; and

f. Other financial and non-financial losses.

## COUNT II

### Violation of Title VII of the Civil Rights Act of 1964 - Gender Discrimination and Violation of Equal Pay Act

### (Against All Defendants)

66. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

67. As a male employee, Plaintiff was a member of a protected class under Title VII.

68. Plaintiff was an African-American male teacher and African-American male teachers are not very common, nevertheless are male teachers common.

16

69. Plaintiff was qualified for his position and performed his job duties satisfactorily.

70. Plaintiff had similar training, education and ability as those of the opposite sex.

71. Plaintiff's employment required substantially the same physical and mental exertion as those of the opposite sex.

72. Plaintiff's employment required substantially the same degree of accountability in the same physical surroundings and hazards of those of the opposite sex.

73. Defendants discriminated against Plaintiff because of his gender through actions including, but not limited to:

a. Applying different standards of conduct and performance;

b. Failing to address the physical assault by a female employee;

c. Subjecting him to disparate treatment in disciplinary matters;

d. Creating and maintaining a hostile work environment;

e. Failing to pay him equally to female employees who held advanced degrees and performed equal work, job responsibilities performed under the same or similar working conditions; and

f. Terminating his employment while treating similarly situated female employees more favorably.

74. Female employees who engaged in similar conduct or had similar circumstances were treated more favorably than Plaintiff.

75. Female employees who had similar education received payment for their advance education.

76. The disparity and divergent treatment of Plaintiff was not based on any objective criterion, such as seniority, quality of production nor merit.

17

77. The reasons given for Defendants' adverse employment actions against Plaintiff were pretextual and designed to mask their discriminatory intent.

78. As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff has suffered damages as previously described.

## COUNT III

## Violation of Title VII of the Civil Rights Act of 1964 and 42 USC § 1981- Hostile Work Environment

## (Against All Defendants)

79. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

80. Plaintiff was subjected to unwelcome harassment based on his race and gender.

81. The harassment was sufficiently severe and pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment, as evidenced by:

a. Continuous discriminatory treatment by Defendant Barone since 2013;

b. Physical assault by Defendant Tapia;

c. Regular incidents of harassment and intimidation;

d. Disparate treatment in work assignments and evaluations;

e. Denial of professional opportunities; and

f. Failure to address reported incidents of discrimination.

82. The harassment was both subjectively and objectively offensive, as demonstrated by:

a. Plaintiff's contemporaneous complaints and reports;

b. Witness accounts of discriminatory treatment;

18

c. Documentation of incidents in HR complaints and EEOC filings;

d. Video evidence of physical assault; and

e. The impact on Plaintiff's working conditions and employment status.

83. Defendants knew or should have known about the harassment and failed to take appropriate remedial action.

84. As a direct and proximate result of the hostile work environment, Plaintiff has suffered damages as previously described.

## COUNT IV

## Violation of Title VII of the Civil Rights Act of 1964 and 42 USC § 1981-

## Retaliation

## (Against All Defendants)

85. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

86. Plaintiff engaged in protected activity under Title VII by:

a. Filing complaints with CMS Human Resources;

b. Filing charges with the EEOC;

c. Reporting incidents of discrimination and harassment;

d. Opposing discriminatory practices; and

e. Participating in investigations of discrimination complaints.

87. Defendants took adverse employment actions against Plaintiff in retaliation for his protected activities, including:

a. Increased scrutiny and harassment;

b. Suspension with pay on November 14, 2023;

19

c. Suspension without pay on February 7, 2024;

d. Termination of employment on March 28, 2024;

e. Negative performance evaluations; and

f. Other adverse employment actions, including seeking the suspension of his teaching license.

88. A causal connection exists between Plaintiff's protected activities and the adverse employment actions, as demonstrated by:

a. The temporal proximity between protected activities and adverse actions;

b. The pattern of escalating retaliation;

c. The pretextual nature of stated reasons for adverse actions, as confirmed by the ultimate dismissal and acquittal on all underlying criminal charges;

d. The disparate treatment compared to employees who did not engage in protected activities; and

e. Direct and circumstantial evidence of retaliatory intent.

89. As a direct and proximate result of Defendants' unlawful retaliation, Plaintiff has suffered damages as previously described.

## COUNT V

## Violation of 42 U.S.C. § 1983 - Equal Protection, Discrimination, Excessive Force, Wrongful Termination, Abuse of Power and Denial of Due Process (Against Individual Defendants in Their Individual Capacities)

90. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein, as well as COUNT VI below.

20

91. The individual Defendants, acting under color of state law, deprived Plaintiff of his constitutional right to equal protection under the law and subjected him to excessive force.

92. Defendants Hill, Barone, and Tapia intentionally discriminated against Plaintiff based on his race and gender through their actions and decisions affecting his employment.

93. Defendants Hill, Barone, and Tapia intentionally created an environment in which it was acceptable to physically assault Plaintiff.

94. Defendant Tapia intentionally used force on Plaintiff.

95. Defendants Hill and Barone abused their power and position to oppress Plaintiff and taint his employment, as well as, retaliate against him for requesting equal treatment.

96. Defendants Hill and Barone denied Plaintiff procedural and substantive due process. Plaintiff's hearing was held in a manner that did not provide proper notice nor opportunity to be heard. Defendants allowed hearsay and other testimony to support a decision to deprive him of his contract and property interest in his employment.

97. The individual Defendants' conduct was motivated by discriminatory intent and resulted in disparate treatment of Plaintiff compared to similarly situated employees.

98. The individual Defendants' actions were taken pursuant to an official policy or custom of discrimination within CMS, or alternatively, represented deliberate indifference to Plaintiff's constitutional rights.

99. As a direct and proximate result of the individual Defendants' violations of his constitutional rights, Plaintiff has suffered damages as previously described.

## COUNT VI

## Assault and Battery

## (Against Defendant Tapia and, to the Extent Immunity Is Waived Pursuant to N.C. Gen. Stat. § 115C-42, Defendant Board; and Against Defendants Hill and Barone in Their Individual Capacities Only)

100. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

101. On January 27, 2023, Defendant Tapia intentionally and without consent:

 a.  Blocked Plaintiff's path multiple times;

 b.  Elbowed him in the chest twice;

 c.  Attempted to grab his upper arm; and

 d.  Made threatening gestures and movements toward him.

102. Defendant Tapia's actions were intended to cause harmful or offensive contact with Plaintiff's person, or created a reasonable apprehension of such contact.

103. Defendant Board is vicariously liable for Defendant Tapia's actions as they occurred within the scope of her employment, to the extent that Defendant Board has waived its governmental immunity by the procurement of liability insurance pursuant to N.C. Gen. Stat. § 115C-42 or as otherwise alleged.

104. Defendants Hill and Barone, by creating and maintaining an environment in which physical assault of Plaintiff was tolerated, are liable in their individual capacities for the assault and battery upon Plaintiff.

22

105. The individual Defendants' conduct with respect to the assault committed by Defendant Tapia was not merely negligent but reflected deliberate indifference and personal animus toward Plaintiff rising to the level of malice.

106. Defendant Barone, who was Plaintiff's direct supervisor and had supervisory authority over Defendant Tapia, was aware of the January 27, 2023 assault and took no disciplinary action against Tapia whatsoever.

107. Despite possessing this knowledge, Defendant Barone testified at the termination hearing that she would not feel comfortable working with Plaintiff again — citing in part his behavior at the very hearing where he sought to defend himself — while volunteering that a colleague had described Plaintiff as "misogynistic" and that she believed Plaintiff held "a hard time with women in leadership."

108. Defendant Barone further misrepresented to the Board the very reason Plaintiff took medical leave following the assault, falsely attributing his leave to "anxiety over me" rather than the documented physical attack by Tapia, thereby minimizing the assault and its consequences in the record before the decision-making body.

109. This pattern — permitting the assault without consequence, actively undermining Plaintiff's account of his injuries, and using Plaintiff's protected complaints against him at the termination proceeding — reflects a willful and malicious intent to harm Plaintiff rather than any good faith exercise of supervisory authority.

110. As a direct and proximate result of Defendants' actions, Plaintiff suffered:

  a.  Physical pain and discomfort;

  b.  Emotional distress and anxiety;

  c.  Fear and apprehension;

23

d. Medical expenses; and

e. Other damages as previously described.

**COUNT VII**

**Negligent Supervision and Retention**

**(Against Defendant Board, to the Extent Immunity Is Waived Pursuant to N.C. Gen. Stat. § 115C-42, and Against Defendants Barone and Hill in Their Individual Capacity Only)**

111. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

112. Defendants Board and Dr. Hill had a duty to properly supervise employees and prevent foreseeable harm to other employees.

113. Defendants knew or should have known of the discriminatory and hostile conduct of Defendants Barone and Tapia toward Plaintiff.

114. Despite this knowledge, Defendants:

a. Failed to properly supervise Defendants Barone and Tapia;

b. Failed to take appropriate corrective action;

c. Retained Defendants Barone and Tapia in positions of authority;

d. Failed to implement proper anti-discrimination policies; and

e. Failed to protect Plaintiff from foreseeable harm.

115. Defendant Board's liability for negligent supervision and retention is asserted to the extent it has waived its governmental immunity by the procurement of liability insurance pursuant to N.C. Gen. Stat. § 115C-42. Defendant Hill is sued in her individual capacity only under this Count.

116. The malice underlying Defendants' negligent supervision and retention of the offending employees is demonstrated not only by Defendants' failure to act, but by their affirmative use of institutional authority to suppress Plaintiff's complaints and conceal their inaction.

117. Defendant Barone received anonymous emails with a mugshot of Plaintiff from an unidentified sender using the address "concernedsaints92@yahoo.com" — an address she acknowledged she could not identify and which may have originated from someone seeking to "get [Plaintiff] fired" — yet she forwarded these materials to employee relations and the superintendent without investigating their source or provenance, using them to initiate the investigation that ultimately led to Plaintiff's termination.

118. Defendant Hill acknowledged at the termination hearing that her recommendation for dismissal was based in part on the pattern of arrests documented in those same anonymous tips, yet her January 26, 2024 notice letter stated the district has not received any documentation that your charges have been dismissed, even though Defendant Nash conceded under cross-examination that the Kentucky charges had been cleared "last month" — *i.e.*, February 2024, before the March 28 hearing.

119. Rather than correcting this material misstatement before proceeding, Defendants convened and completed the termination hearing on a factual record they knew to be false. The knowing use of a materially false charge — that Plaintiff's criminal matters remained unresolved — as the basis for terminating a twelve-year employee without correction or inquiry reflects not inadvertence but willful and malicious disregard for Plaintiff's rights and livelihood.

120. Defendants' negligent supervision and retention of Defendants Barone and Tapia directly and proximately caused Plaintiff's damages as previously described.

## COUNT VIII

## Intentional and/or Negligent Infliction of Emotional Distress

## (Against Defendant Board, to the Extent Immunity Is Waived Pursuant to N.C. Gen. Stat. § 115C-42, and Against Defendants Hill and Barone and Tapia in Their Individual Capacities Only)

121. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

122. Defendants engaged in extreme and outrageous conduct beyond the bounds of decency by:

   a. Allowing and perpetuating systematic discrimination;

   b. Permitting physical assault without consequence;

   c. Engaging in retaliatory termination based on criminal charges that had been or were in the process of being dismissed;

   d. Creating and maintaining a hostile work environment; and

   e. Causing deliberate harm to Plaintiff's professional reputation.

123. Defendants' conduct was intended to cause severe emotional distress or was carried out with reckless disregard of the probability of causing such distress.

124. Defendant Board's liability under this Count is asserted to the extent it has waived its governmental immunity by the procurement of liability insurance pursuant to N.C. Gen. Stat. § 115C-42. Defendants Hill and Barone are sued in their individual capacities only under this Count.

26

125. As a direct and proximate result of Defendants' extreme and outrageous conduct, Plaintiff has suffered severe emotional distress, including:

a. Anxiety and depression;

b. Sleep disturbance;

c. Physical manifestations of stress;

d. Need for medical and psychological treatment; and

e. Other emotional and psychological damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Johnny E. Miller respectfully requests that this Court enter judgment in his favor and against Defendants, jointly and severally, and grant the following relief:

A. Declare that the acts and conduct of Defendants constitute violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1983, and related federal and state laws;

B. Award Plaintiff back pay, including but not limited to lost wages, bonuses, benefits, and other compensation, plus interest, from the date of his wrongful termination until the date of judgment;

C. Award Plaintiff front pay in lieu of reinstatement;

D. Award Plaintiff compensatory damages for emotional distress, mental anguish, loss of dignity, humiliation, damage to reputation, and other non-pecuniary losses in an amount to be determined at trial;

27

E. Award Plaintiff punitive damages against the individual Defendants in an amount sufficient to punish them for their willful, wanton, and malicious conduct and to deter similar conduct by others;

F. Order Defendants to reinstate Plaintiff to his former position with appropriate back pay and benefits or, in the alternative, to pay front pay and benefits in lieu of reinstatement;

G. Order Defendants to expunge from Plaintiff's personnel files all negative documentation relating to his termination and the discriminatory treatment he experienced;

H. Order Defendants to implement effective policies and procedures to prevent discrimination, harassment, and retaliation in the workplace;

I. Award Plaintiff reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and other applicable statutes;

J. Award Plaintiff pre-judgment and post-judgment interest as provided by law;

K. Award Plaintiff such other equitable relief as the Court deems appropriate and just under the circumstances; and

L. Grant such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

28

*/s/Sharika M. Robinson*
SHARIKA M. ROBINSON,
North Carolina Bar No.: 44750
THE LAW OFFICES OF SHARIKA M
ROBINSON, PLLC
10230 Berkeley Place Drive, Suite 220
Charlotte, NC 28262
Telephone: (704) 561 6771
Telefax:     (704) 561-6773
*Counsel for Plaintiff*

29